SUMMERS, Justice.
Plaintiffs and appellants are thirty-seven qualified voters and property taxpayers within what purports to be the Hackberry Recreation District in Cameron Parish. They seek an injunction against its commissioners, defendants herein, to prohibit the issuance or selling of bonds, or the assessment or collection of any taxes by that body.
Cities Service Refining Corporation, Pan American Petroleum Corporation and Olin Mathieson Chemical Corporation own property aggregating approximately fifty-five percent of the total assessment in the recreation district, and they have intervened in support of the plaintiffs’ position.
The district court denied the injunction. This appeal followed.
Our jurisdiction is governed by Article XIV, Section 14(d—4) and Article VII, Section 10(1) of the Constitution of Louisiana, LSA. These articles constitute recreation districts as subdivisions of the State; and provide that, when the constitutionality or legality of taxes to be imposed and collected by subdivisions of the State are attacked, this court has appellate jurisdiction.
By LSA-R.S. 33:4562 et seq., police juries are authorized and empowered to. *473 form and create recreation districts; to own and operate playgrounds and facilities; to engage in activities which would promote recreation and any related activity designed to encourage recreation and promote the general health and well-being of youth. These recreation districts are authorized to vote and levy special maintenance taxes, and issue bonds when authorized to do so by a vote of the qualified electors of the district.
Acting pursuant to this authority the police jury of Cameron Parish adopted Ordinance No. BX-4, 1960, creating the Hack-berry Recreation District, and defined its boundaries as follows:
“Commencing at the NW Corner of Section 3, Township 12 South, Range 12 West, La. Mer., thence running South to SW Corner of Section 34, Township 13, South, Range 12 West, thence running East to the SE corner of Township 13 South, Range 11 West, thence South to Calcasieu Lake, thence Westerly along West bank of Calcasieu Lake to the Calcasieu Parish line, thence West along the line between the Parishes of Calcasieu and Cameron, Louisiana to point of commencement, and being the whole of Ward 6 of Cameron Parish, Louisiana.”
This ordinance also named and appointed the defendants as the five commissioners of the district, established Hackberry as the domicile of the district and fixed June 6 1960, as the date of the first meeting for the election of officers.
Accordingly, after their appointments the commissioners met, a chairman was elected and the organization completed. Subsequently, other meetings were held, an engineer was employed, and members of the commission accompanied advisors and consultants on trips of inspection of other recreational facilities in the area, and preliminary plans were prepared for the proposed recreational facility.
Thereafter, pursuant to resolution and order of the commissioners and legal notices published on August 12, 19, 26 and September 2, 9, and 16, 1960, a spécial election was called for September 17, 1960, to submit two propositions to the resident property taxpayers qualified to vote in the district: (1) to issue bonds to the amount of $290,000.00; and (2) to levy a four-mill maintenance and operations tax. Both propositions were adopted by a favorable majority, the results of the election being:
FOR: 126 votes, representing an assessed property valuation of $125,207.-50.
AGAINST: 79 votes, representing assessed property valuation of $101,-425.19.
On September 6, 1960, the Police Jury of Cameron Parish adopted Ordinances, Nos. BX-8 and BX-9,1960, redefining the bound *475 aries of “Ward 6 and the Hackberry Recreation District. However, these ordinances were not published in the official journal of the parish until September 30, 1960.
The defendants did not take their oaths of office as commissioners of the Hack-berry Recreation District until October 3, 5, and 6, 1960.
, Originally plaintiffs contended that the election was invalid because of irregularities at the. polls. However, after a recount of the ballots, under the supervision of the trial court, this position was abandoned.
' Plaintiffs persist in the other issues of the case contending for the invalidity of the proceeding leading to the elections because:
(1) The description of the boundaries of the Hackberry Recreation District is so vague, uncertain and defective, no valid recreation district ever came into existence.'
(2) • There -was no commission, either de jure or de facto, because no district had beén created and the commissioners had not taken their oaths of office.
(3) Even if the district were properly created and the commissioners were de facto officers, the proposed bond issue and tax levies were so grossly excessive ' as to constitute a taking of property 'without due process of law and' tb'e -proposed' action is an illegal abuse of power by the defendants acting as commissioners.
We consider first the contention of plaintiffs that the description of the boundaries of the Hackberry Recreation District are so vague, uncertain and defective that it could not serve to define the area of the district, and hence the district was never legally created and all subsequent actipns of its Board of Commissioners and the election of September 17, 1960, are null and void.
Since the Hackberry Recreation District is a political subdivision of the State, having the power of taxation when authorized by the qualified electors of the district, undoubtedly the rules of law governing the designation of boundaries 'of municipal corporations, and other governmental subdivisions having the power of taxation, will serve as a guide in determining the sufficiency of the designation of boundaries of recreation districts created under LSA-R.S. 33:4562 et seq. See McQuillin, Municipal Corporations, 3rd Ed., §§ 7.04 and 7.05.
The description used by the police jury in. Ordinance No. BX-4, 1960, in defining the boundaries of the Hackberry Recreation District, is the same as that used to designate the boundaries of Ward 6 of Cameron Parish, which were established in 1911. An important fact to be noted is the reference in the description of the rec *477 reation district to its “being the whole of Ward 6 of Cameron Parish, Louisiana.”
It follows, therefore, that any valid objection to the description of the recreation district must be a valid objection to the description of Ward 6 of Cameron Parish. Likewise any attribute of legality attaching to the description of Ward 6 must necessarily serve as an aid to the legality of the description of the recreation district. The two are concomitant.
It is represented, and not denied, that since its creation in 1911 Ward 6 has been recognized as a legally created ward for the purpose of the issuance of bonds and taxation, and no one has complained as to the defects in the boundaries since that date.
Furthermore, we note that a stipulation discloses the exact amount of the assessed valuation of property belonging to the intervenors, and the valuation of all properties in the recreation district on the Cameron Parish tax rolls for the year 1960. Though the description of the recreation district contained in Ordinance No. BX-8 revising the Ordinance BX-4 of June 6, 1960, is represented as the basis for these ascertainments, we fail to understand how it could serve to more definitely enable the parties to determine the boundaries of the district than the one contained in Ordinance BX-4, 1960. The reason being that reference is made in each to certain calls within Township 13 South, Range 12 West. It is the reference to these calls 'in the description in Ordinance BX-4, 1960, which forms the primary basis for the objection that the description there is too indefinite to permit the recreation district to be validly formed. The basis of the objection is that Township 13 South, Range 12 West, has never been surveyed;' that the sections of that township and range are perforce irregular, inasmuch, as adjoining surveys to the east and west do not leave sufficient area to permit the continuation of the adjoining township and range lines through the unsurveyed area without digression, variation and adjustment, and hence Section 34, located in Township 13 South, Range 12 West, cannot be definitely located.
The description of the recreation district complained of purports to place the area in two townships, the northernmost of which has been surveyed and there is no dispute relating to the location of the recreation district boundaries there, except the eastern boundary which lies along the shores of Calcasieu Lake. There is,some question as to whether that eastern boundary is the eastern or western bank of the lake (which is oblong and runs generally in a northerly and southerly direction).
The first call in the description at the northwest corner of Section 3, Township 12 South, Range 12 West, is the call located in the township for which • governmental surveys are available, and no -cjifficulty, js *479 presented in locating that point. The next call purports to be the southwest corner of Section 34, Township 13 South, Range 12 West, and this latter township and range are south of Township 12 South, Range 12 West. There is no official government survey of that township which lies to the south and for this reason plaintiffs’ surveyors testify that the latter point cannot be located with any degree of certainty.
The evidence is to the effect that the point represented by the southwest corner of Section 34, Township 13 South, Range 12 West, would lie twelve miles immediately south of the point represented by the northwest corner of Section 3, Township 12 South, Range 12 West, if the former point had been surveyed, and if that survey followed a regular pattern of regular section, township and range lines. This conforms to the general knowledge we all entertain of governmental surveys.
Plaintiffs have introduced maps in evidence which they contend would probably represent the surveyed Township 13 South, Ranges 11 and 12 West, if they were surveyed. These maps are drawn to show there is insufficient land in the area of Township 13 to make placement of regular range lines in the unsurveyed area. They attribute this deficiency to surveys made to the east and west which, if observed, would infringe upon the area of Township 13 South, Ranges 11 and 12 West. However, these surveys, though referred to, are not in the record. The result is that the affected township and ranges would contain irregular sections according to plaintiffs’ surveyors. Thus, Section 34, Township 13 South, Range 12 West, would be at a point considerably to the east of a line due south of the northwest corner of Section 3, Township 12 South, Range 12 West.
Undoubtedly the description of Ward 6, as prepared in 1911, was prepared on a projection that Township 13 South, Ranges 11 and 12 West, were regular, or, when surveyed they would be regular, and the range lines in that township were projected to be a continuation due southward of the range lines in Township 12 South, Ranges 11 and 12 West, to the north. On the basis of this projection no difficulty is experienced in locating Section 34, Township 13 South, Range 12 West and, with this point, the western and southern boundaries of the recreation district or those of Ward 6.
The lack of government surveys affecting Township 13 South, Ranges 11 and 12 West, is attributed to the topography of the area, it being salt marsh and difficult of access. The testimony is to the effect that a survey of the area on the ground would be extremely costly. We do1 not hesitate to deduce that in the year 1911 the topographical conditions were worse, and hence the description of Ward 6 was prepared on the basis of the projections which we have recognized.
*481 Though this situation exists which, according to plaintiffs, makes reliance on surveys impracticable for the purpose of defining the boundaries of the recreation district or of Ward 6, below Township 12, the defendants’ surveyors, though admitting the possibility of some shortage of land and irregularity in Township 13 South, Ranges 11 and 12 West, testified that in determining the boundaries, in the absence of a survey to the contrary, they must assume that they were regular. Based upon this assumption, Section 34, Township 13 south, Range 12 West, would be situated six miles due south of Section 34, Township 12 South, Range 12 West, or 12 miles due south of Section 3, Township 12 South, Range 12 West. But even if Township 13 South, Ranges 11 and 12 West, were irregular, they could nevertheless locate Section 34, Township 13 South, Range 12 West, on the ground adopting practices and rules for surveying prescribed by competent authority.
All of the surveyors agree that, generally, section and township lines are followed in laying out governmental subdivisions, as this practice relieves the authorities of the problem involved in computing the divided acreage resulting from governmental subdivision lines running diagonally across sections.
It is true that in determining the boundaries of such a subdivision it would be better practice to run a straight line from one call to another. On the basis of the projection which we find was intended the line would run straight south from the northwest corner of Section 3, Township1 12 South, Range 12 West, to the southwest corner of Section 34, Township 131 South, Range 12 West. This obviously better practice lends further reliability to-our conclusions for, based upon a projection of a regular Township 13 Sortth, Range 12 West, the western boundary of Ward 6 and the recreation district would lie along section lines.
All of the circumstances surrounding this case persuade us to conclude that it was. the intention of the drafters of the description of Ward 6 and the recreation district to make the western boundary a line due south from the northwest corner of Section 3, Township 12 South, Range 12 West, to a point where Section 34, Township 13 South, Range 12 West, would be located if the township and range lines south of Township 12 South, Range 12 West, were regularly projected. This is borne out by the south bearing of the western boundary line, which is south from the northwest corner of Section 3, Township 12 South, Range 12 West, and the location o.f Section 34, Township 13 South, Range 12 West, due south thereof, assuming the regularity of the township and range as projected. In addition, the bearing of the southern boundary line of the recreation district, from the southwest corner of Section 34, *483 Township 13 South,i Range 12 West, east? ward, bears, out our understanding of what was intended, for such a line falls at the next call which is the southeast corner of Township 13 South, Range 11 West. Thereafter, “then south to Calcasieu Lake” is a logical continuation of this line to a geographical landmark, the bank of the lake.
Defendants’ witness, a surveyor, compared the description of Ward 6 with that of Ward 5, the adjoining ward to the west and south, to ascertain if their boundaries coincide. This practice is acceptable and is resorted to in an effort to clarify ambiguities in boundaries. As that witness testified : “ * * * This would be true in any survey or any boundary study, the surveyor or engineer would always want to acquaint himself with the adjoining area.”
It is noted that the description of the eastern boundary of Ward 5 where it coincides with the western boundary of Ward 6 reads as follows: “Commencing at the NE cor. of Sec. 4, Tp. 12 S., R. 12 W.; thence running south to S.E. cor. of Sec. 33, Tp. 13 S.R. 12 W.; thence east to N.E. cor. of Tp. 14 S., R. 11 W. * * *” These calls and bearings coincide with those of 'the .western and southern boundaries of the, recreation district and Ward 6, and are based upon a projection of regular sections, townships,and ranges into the unsurveyed area. • •
We find no difficulty in concluding that the eastern boundary of the recreation' disr trict and Ward 6 is along the west bank of Calcasieu Lake. Although the description reads “thence Westerly along the West Bank of Calcasieu Lake to the Calcasieu Parish line”, (Emphasis added.) reference to the maps introduced in evidence readily discloses that the bearing .should have been easterly along the west bank of the lake. This uncertainty is clarified by the fact that continuation of the boundary in a westerly direction would cause an overlap of Ward 6 with a portion of Ward S, and by the further fact that a subsequent ordinance of the police jury, adopted in 1917, shows that in its description of Ward 6 an “easterly” direction is substituted for the word “westerly” used in the ordinance of 1911. An additional ambiguity is observed when it is noted that the west bank of Calcasieu Lake is a meander, and pursuing its length to the boundary between Calcasieu and Cameron Parishes on the north discloses bearings of easterly, northerly and westerly.
The realistic approach requires acceptance of the interpretation we have adopted. In view of the foregoing considerations and the fact that in defining the boundaries of Ward 3, which lie to the east of Ward 6, the eastern and southern banks of Calcasieu Lake are mentioned in the 'traverse of the lake; we conclude that the east boundary of Ward 6. follows the west banlr *485 of Calcasieu Lake from the fourth call in 'the description, a point along the west bank of Calcasieu Lake, to the Calcasieu Parish line. The use of the words “thence westerly” instead of “thence easterly” or “thence northeasterly”, which would have been more accurate, is an error which is clarified by the other facts and circumstances we have mentioned.
Our approach to this problem is sanctioned by a recognized authority in such matters in this language:
“If the description of the boundaries in a statute cannot be literally applied on account of inaccuracy, the statute must receive a reasonable construction in order to carry into effect the intent of the legislature.” McQuillin, Municipal Corporations, 3rd Ed. § 7.05.
We find applicable to this case the following propositions of law as applied to the interpretation of descriptions in deeds, which, though more demanding than the rules to be applied to the interpretation of descriptions of property forming governmental subdivisions, are nevertheless complied with by the facts before us.
In Emerson v. Cotton, 209 La. 1003, 26 So.2d 16, 19, it was observed: “Description of property in deeds must be liberally construed to sustain rather than defeat a conveyance.” See 'also Canterberry v. Slade Brothers, 232 La. 1081, 96 So.2d 4; Magnolia Petroleum Co. v. Marks, 225 La. 805, 74 So.2d 36; Snelling v. Adair, 196 La. 624, 199 So. 782.
We think it true, under legal authority, that liberality in construction should be applied to the description of a governmental subdivision to sustain its validity rather than defeat its existence. 26 C.J.S. Deeds § 30h. Public policy supports this rule too, for the chaos and turmoil which would ensue in the affairs of a governmental subdivision as a result of a belated declaration of the invalidity of its boundaries after many years of acceptance and usage should be apparent to all.
Undoubtedly the long usage and acquiescence of the people, residents and taxpayers, of Ward 6 since 1911 have established the boundary. We find this to be correct 'for we note that it has been feasible to ascertain the total assessment of that ward; it has served as a basis for taxation and government all these years, and to declare the recreation district invalid we would, in effect, have to say that Ward 6 is not described with sufficient definiteness to permit validity to attach to its activities in the past. We decline to do so for we feel an unbiased and energetic effort to determine the •boundaries would have resulted in the conclusion we have reached, making proper allowances for the topography of the area, *487 the lack of governmental surveys and the problems confronting the drafters of the description of Ward 6 in 1911.
And so we hold that the description employed by the Cameron Parish Police Jury in creating the Hackberry Recreation District in its Ordinance No. BX-4, 1960, is not ■so vague, indefinite or uncertain as to prevent the valid creation of the district and nullify the election in question.
We look next to the contention of plaintiffs that there was no commission, either de jure or de facto, because no district had been created and the commissioners had not taken their oaths of office.
Because we have held that the district was created, the offices of the district .are then de jure offices. It remains to determine whether, because the officers appointed did not take their oaths of office within the thirty-day period provided by LSA-R.S. 42:141, they can be de facto officers. If it is found that they were de facto officers, their actions taken on behalf of the district are then clothed with the validity which the law requires.
The defendants took possession of their offices as members of the Board of Commissioners of the district under color of a valid appointment by the Cameron Parish Police Jury. They were named and appointed as such in the Ordinance of June 6, 1960, and in further confirmation thereof they were issued certificates evidencing their appointments. Acting under this authority, an organizational meeting was held and the officers of the Board were elected in accordance with law. Thereafter, the commissioners performed the duties of their office by holding meetings, inspecting recreational facilities at nearby towns, employing an engineer to draft plans for the proposed recreational facility, and by adopting the necessary resolution and issuing the requisite order for calling the election that is contested in this suit.
These actions are the very duties required by their offices, the exercise of which is such as to make manifest their intention to occupy those offices and exercise the duties thereof. From these actions the general public was made aware of the fact that these offices were held by the parties involved, for necessarily the functions which they exercised required that they be recognized as such, and these functions could not have been carried out without such recognition by those who dealt with them. They were therefore de facto officers whose acts, including the calling of the election on September 17, 1960, and the promulgation of the results thereof, were valid and effective.
This court has repeatedly held that a public officer’s failure to qualify under LSA-R:S. 42:141 will not vitiate his acts *489 -if he fulfills the requirements of a de facto ■ officer. In State v. Hargis, 179 La. 623, 154 So. 628, a clerk of court failed to qualify 'by failing to furnish bond required by law within thirty days after having received his • commission. Nevertheless, he took physical possession of the office and performed the duties of clerk for approximately two years before it was discovered that he had not furnished a bond. In ruling on an accused’s objection to proceeding with a trial of a criminal case on the ground that the court was not legally constituted due to the lack of a clerk of court, the court recognized the following to be controlling under ■these facts:
“A person is a de facto officer where he exercises the duties of an office under color of a known and valid appointment or election, but where he failed to conform to some precedent, requirement, or condition, as to take an oath, give a bond, or the like. Vide, ‘Public Officer,’ 22 R.C.L. § 306, p. 588.
“A de facto officer is no more a usurper than is a de jure officer. As long as he is in possession of the office he will be a de facto officer, and all .acts performed by him in the exercise ■of his official functions and strictly within the limits of existing statutes will be considered legal. This is from •considerations of public policy.
“The de facto doctrine was introduced into the law as a matter of policy and necessity to protect the interests of the public and individuals, where those interests were involved in the official acts of persons exercising the duties of an office, without being lawful officers. 22 R.C.L. § 307, p. 589.
“And the acts of an officer de facto are as valid and effectual where they concern the public or the rights of third persons, until his title to the office is adjudged insufficient, as though he were an officer de jure. 46 C.J. § 378, p. 1060.”
And in State v. Mayeux, 228 La. 6, 81 So.2d 426, where a deputy sheriff failed to take the oath of office or file the bond required by law, the court said:
“In the case of State v. Hargis, 179 La. 623, 154 So. 628, a de facto officer is defined as a person who exercises the duty of an office under color of a known valid appointment or election, but who failed to conform to some precedent, requirement, or condition, as to take an oath, give bond, or the like. See also 67 C.J.S. Verbo Officers § 146, page 447. It is stated in State v. Breedlove, 199 La. 965, 993, 7 So.2d 221, 230 that ‘the jurisprudence of this State is well-established that the acts of an officer de facto, so far as they affect the public, should be recognized as valid.’ ”
*491 The final question presented is whether the proposed bond issue and tax levies were so grossly excessive as to constitute a taking of property without due process of law, and hence whether the proposed action is an illegal abuse of power by the defendants acting as commissioners. The recreation district, acting through its Board of Commissioners, is authorized by law to issue bonds in order to purchase land and to construct recreational facilities in the district, and to levy a special tax to maintain and operate same. LSA-R.S. 33 :4566. The amount of the bond issue and 1;ax in question are within the limits prescribed by the constitution and statutes of the State of Louisiana. The commissioners have therefore not exceeded that authority.
It is a position of the defendants that the court does not have the authority to review all of the various facts affecting the feasibility of the proposed recreational project. This is true, it is asserted, unless the court rules that it has the power to substitute its discretion and judgment for that of the legislature, which passed the required resolution for amending the Constitution of the State of Louisiana authorizing recreational districts, and vesting them with the authority to hold elections and issue bonds; or, unless the court would substitute its discretion for that of both the electorate, which voted in favor of the constitutional amendment, and the-Louisiana Legislature which has enacted' LSA-R.S. 33:4562 et seq. (as amended) authorizing the creation of recreational1 districts, and conferring authority on those-districts to incur debt and issue bonds under certain limitations which have not been-exceeded here.
 Needless to say, we are cognizant of the doctrine which accords governmental subdivisions discretion in determining how-to spend the money of which they have the-administration. We recognize that such a prerogative should not be infringed upon-by the courts; and, for the judiciary to-meddle in such matters, save for the purpose of preventing injustice, fraud, oppression, or gross abuse of power, would' be for it to invade the domain of other departments of the government in violation of the express prohibitions of the constitution for separation of powers. Murphy v. Police Jury, St. Mary Parish, 118 La. 401, 42 So. 979. However, we are also aware that there is a point beyond which-the legislative department, even when exercising the power of taxation, may not go- and remain consistent with its obligation-to recognize the citizen’s right not to have his property taken without due process of' law. Norwood v. Baker. 172 U.S. 269 19 S.Ct. 187, 43 L.Ed. 443. The exaction from the owner of private property of the: *493 cost of the public improvement in substantial excess of the special benefits accruing to him is, to the extent of such excess, a taking, under the guise of taxation, of private property for the public use without compensation. Norwood v. Baker, supra.
In Wight v. Police Jury, 5 Cir., 264 F. 70S, it is said:
“ * * * All of the rules which have been announced with reference to districts of any kind recognize the possibility of unjust, unreasonable, arbitrary action. The courts, while going far to sustain action creating districts and levying taxes and making assessment, nevertheless give efficient life to the constitutional provision which prohibits the taking of private property without due process of law.”
The right of the courts to determine whether the action of the commission here is unjust, unreasonable or arbitrary cannot be questioned. It is for this very reason the judiciary exists, and acts as a check upon abusive exercises of power by such a commission. The real concern, therefore, is not whether this question comes within the province of the judiciary, but whether the action of the commission under the facts and circumstances of this case is such that it should be restrained
The plans which the commissioners of the recreation district had made prior to the institution of this suit were .to a great extent tentative. Although the election was called to permit the issuance of bonds to the extent of $290,000, the testimony does not support the conclusion that that amount was definitely intended to be fully expended. Likewise, no precise' or irrevocable determination had been made as to the amount of millage to be levied for maintenance, although the election authorized a levy not to exceed four mills. As we understand the evidence, the $290,-000 bond issuance approved in the election was a maximum authorization for the purpose of purchasing and acquiring lands, buildings, equipment and other facilities necessary to provide recreation service in the district. It does not necessarily follow that the full authorization will be expended. The same is true of the levy for maintenance. Though four mills is authorized, it does not follow that the full amount will be collected and used. With respect to the levy for maintenance the plan is to levy just the amount needed to be determined by experience after operations commence; and, with respect to the bond issue, that amount will be determined within the stated limitation after the construction plans'.are finalized. There is some indication that economies may be practiced which could result in savings.
*495 The planned expenditure for the Hack-berry Recreational District, when compared to other districts in the area, indicates that the Hackberry district will spend more money to serve a lesser population than the other districts. It is'shown, however, that the quality of the Hackberry district’s construction will be somewhat better and probably more durable. It is also true that the recreation districts used for comparison have other recreational facilities in close proximity which serve to round out their program, whereas the Hackberry district, being more isolated geographically from other districts, will need to depend solely upon their own facilities.
We think the trial court has stated the correct conclusion in the opinion rendered below in these words:
“The preponderance of evidence on the subject is in favor of the plaintiffs’ position that the amounts which the district proposes to spend for the recreation facilities and the maintenance and operations tax are greater than the need when compared with the recreational facilities of other .communities. However, this Court cannot say that there is no room for a difference of opinion in this regard, or that the project is so costly that the action taken amounts to a gross abuse of the authority granted by law to the district.”
The discretion allowed the district in. such cases as the instant one is broad, and', that discretion will not be interfered with, by the courts unless there is a clear abuse and the action complained of is unjust, unreasonable and arbitrary. Myles Salt Co-v. Board of Commissioners of Iberia Drainage District, 239 U.S. 478, 36 S.Ct. 204, 60 L.Ed. 392; Cart v. City of Jennings, 210 La. 748, 28 So.2d 39.
Although the wisdom of the expenditures might be questioned, we cannot say that the local authorities who are close to-the facts and circumstances have acted unjustly, unreasonably or arbitrarily and abused the broad discretion allowed them, by law.
Judgment affirmed.