964 So.2d 967 (2007)
STATE of Louisiana
v.
Derrick Todd LEE.
No. 2005 KA 0456.
Court of Appeal of Louisiana, First Circuit.
May 16, 2007.
*972 Richard J. Ward, District Attorney, Becky L. Chustz, Assistant District Attorney, Port Allen, Counsel for Appellee State of Louisiana.
Gwendolyn K. Brown, Baton Rouge, Counsel for Defendant/Appellant Derrick Todd Lee.
Before: PARRO, McDONALD, and HUGHES, JJ.
HUGHES, J.
Defendant Derrick Todd Lee was charged by grand jury indictment with the first degree murder of Geralyn Barr DeSoto, a violation of LSA-R.S. 14:30. The state amended the indictment to charge defendant with second degree murder, a violation of LSA-R.S. 14:30.1. The defendant pled not guilty. After a trial by jury defendant was found guilty as charged. Defendant made an oral motion for a new trial and an appeal. Subsequently, he filed a written motion for a new trial, an amended motion for a new trial, and a notice of intent to appeal. After a hearing, the trial court denied the motion for a new trial. Defendant then made an oral motion for mistrial that was also denied. After the appropriate delays, the trial court sentenced defendant to the mandatory term of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. Defendant now appeals, raising eight assignments of error.

FACTS
Darren DeSoto left his Addis trailer home around 7:00 a.m. on January 14, 2002 and drove to work. Geralyn DeSoto, Darren's wife and the victim in the instant matter, contacted an employment company about a position listed on the company's website. Geralyn was a student at Louisiana State University and was planning to attend graduate school in the fall of 2002. She wanted to work and save money to pay her future tuition. Between 9:00 and 10:00 a.m., someone from the agency contacted Geralyn and scheduled a job interview for 2:30 p.m. that day.
Geralyn drove to LSU to pay the tuition for a class she was taking during the spring semester. While there she met and talked with another student. Around 11:00 a.m. she left to return home. At 11:41 a.m. Geralyn sent an e-mail to one of her professors. At 11:50 a.m. a telephone call was placed from the telephone in Darren and Geralyn's trailer to a phone located at the Exxon refinery in Baton Rouge. The call lasted less than a minute. That afternoon Geralyn failed to appear for her job interview. The employment agency called Geralyn's home, but there was no answer.
*973 Darren left his job around 6:15 p.m. He was concerned because he had called his wife several times during the day with no answer. He arrived home around 7:00 p.m. and found the trailer door slightly open. At first he did not believe his wife was home, but when he looked down the hall, he discovered her lying on her side in a pool of blood. Darren touched his wife's body and found that it was cold. He also saw that her throat had been cut. He ran to the home of a neighbor, who called the police. Geralyn DeSoto was pronounced dead at the scene.

NON-UNANIMOUS JURY VERDICT
In assignment of error number one, defendant argues that in light of recent jurisprudence, LSA-C.Cr.P. art. 782(A) (providing for jury verdicts of 10 to 2 in cases in which punishment is necessarily confinement at hard labor) violates the Sixth and Fourteenth Amendments of the United States Constitution. Thus, the defendant contends that the 11 to 1 jury verdict was unconstitutional.
The state, citing Louisiana jurisprudence, contends that this issue is well-settled and that the Louisiana Supreme Court has held that a non-unanimous jury verdict does not violate the Constitution.
The punishment for second degree murder is confinement for life at hard labor. See LSA-R.S. 14:30.1(B). Louisiana Constitution Article I, § 17(A) and LSA-C.Cr.P. art. 782(A) provide that in cases where punishment is necessarily at hard labor, the case shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. Under both state and federal jurisprudence, a criminal conviction by a less than a unanimous jury does not violate a defendant's right to trial by jury specified by the Sixth Amendment and made applicable to the states by the Fourteenth Amendment. See Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); State v. Belgard, 410 So.2d 720, 726 (La.1982); State v. Shanks, 97-1885, pp. 15-16 (La. App. 1 Cir. 6/29/98), 715 So.2d 157, 164-65.
The defendant's reliance on Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), is misplaced. These Supreme Court decisions do not address the issue of the constitutionality of a non-unanimous jury verdict but rather, address the issue of whether the assessment of facts in determining an increased penalty of a crime beyond the prescribed statutory maximum is within the province of the jury or the sentencing judge. These decisions stand for the proposition that any fact (other than a prior conviction) that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. See Apprendi, 530 U.S. at 490, 120 S.Ct. at 2362-63. Nothing in these decisions suggests that a jury's verdict must be unanimous. Accordingly, LSA-Const. art. I, § 17(A) and LSA-C.Cr.P. art. 782(A) are not unconstitutional and do not violate the defendant's Sixth Amendment right to a trial by jury.
This assignment of error lacks merit.

MOTION TO SUPPRESS DNA EVIDENCE
In assignment of error number two, defendant contends that his DNA sample was illegally obtained without a search warrant and that the trial court erred in denying his motion to suppress the DNA evidence.
Defendant's DNA was obtained by a subpoena duces tecum requested by the *974 Louisiana Attorney General's Office. Defendant's DNA profile was matched to the DNA found on the victim in this case and also on D.A., a victim who survived an assault.
The "Motion For Issuance Of Subpoena Duces Tecum" was presented to Judge George H. Ware, Jr. of the 20th Judicial District. The motion explained that the Attorney General's Office was involved in an investigation of the disappearance of Randi Mebruer and the homicide of Connie Warner, both residents of Zachary, and that a DNA specimen of the defendant was necessary to complete this investigation. The motion indicated that the Department of Justice (Attorney General's Office) had been assisting the Zachary Police Department since April 27, 1999 in the investigation in the same Zachary subdivision of the disappearance of Ms. Mebruer from her Zachary residence on or about April 18, 1998 and the homicide of Ms. Warner in August of 1992. The motion further stated that the evidence at the Mebruer residence indicated that she was attacked, severely beaten, and abducted from her residence, and that the incident occurred during a four-hour period between 10:30 p.m. on April 18 and 2:30 a.m. on April 19, 1998. The Zachary police knew the defendant had been arrested as a "Peeping Tom," pursuant to LSA-R.S. 14:284, in the same Zachary subdivision and in St. Francisville, Louisiana.
The motion further stated that on April 20, 1998 Zachary police officers went to defendant's residence and, with his consent, conducted a cursory search of his residence before being asked by the defendant to leave, and since that time, defendant remained a "viable suspect" in the disappearance of Randi Mebruer and a "possible suspect" in the deaths of five females in Baton Rouge and Lafayette who had been linked by DNA profiling to a serial killer.
The motion further indicated that investigators from the Attorney General's Office interviewed defendant and his girlfriend, Cassandra Green, who both indicated separately that on April 18 about 10:30 p.m., they were at a bar in St. Francisville. When they got into an argument, Ms. Green left and went to her home. The defendant drove to a bar in Alsen, Louisiana. He then left and drove to Ms. Green's home in Jackson, where he arrived about 1:00 a.m. on April 19. His route to Ms. Green's home took him directly by the entrance to the Zachary subdivision. Defendant talked to Ms. Green a few minutes and then drove to his home in St. Francisville.
The motion alleged that the Alsen lounge was open for business on April 18-April 19. It detailed defendant's specific arrests and convictions for attempted unauthorized entry of an inhabited dwelling, simple burglary, "Peeping Tom," trespassing, stalking, and aggravated battery and noted that some of the arrests were in Zachary. The motion further alleged that defendant was not incarcerated on the dates of Randi Mebruer's disappearance and the murder of Connie Warner, or of the murders of Charlotte Pace, Gina Green, Pam Kinamore, Trineisha Colomb, and Carrie Yoder.
Finally, the motion indicated that a confidential source (CS) told investigators that defendant had come to his home in Jackson, Louisiana, around midnight "a night or two after Randi Mebruer's disappearance." The CS accompanied the defendant to his residence. In his vehicle, defendant had a long-barreled revolver. After ten to fifteen minutes at the defendant's residence, defendant drove the CS back to his home. Defendant told the CS that he was being harassed by Zachary *975 police about a "missing woman." The next day the CS heard a news report about a missing Zachary woman. The motion did not give any other specific information as to the timing of defendant's statement.
An order was signed by Judge Ware on May 5, 2003 authorizing the issuance of a subpoena duces tecum and directing defendant to produce a DNA specimen. The defendant was swabbed and a DNA sample was obtained. Subsequently, after defendant's DNA was tested and compared, lab reports were issued indicating a high probability that the DNA found on the victim Geralyn DeSoto and on D.A., who survived an attack, was that of the defendant.
At the Motion to Suppress hearing held on May 6, 2004, the only witness called by the state was Danny Mixon, an investigator with the Attorney General's Office. Mixon testified that he was assigned in April of 1999 to help the Zachary police investigate the Warner and Mebruer cases in which defendant was the main suspect. Connie Warner was killed in 1992 and Randi Mebruer, whose body has never been found, disappeared in 1998. The two victims lived in the same Zachary subdivision. Mr. Mixon further testified that defendant had been arrested on two counts of "Peeping Tom" in the same subdivision and for "Peeping Tom" and stalking in St. Francisville.
Mr. Mixon testified that a search warrant was not sought because it was believed the subpoena duces tecum was sufficient to obtain the DNA sample. He noted that he had previously used a subpoena duces tecum for handwriting samples, phone records, and fingerprints. Mixon and Zachary Police Officer Ray Day approached Judge Ware to have the subpoena duces tecum issued. Mixon noted that Judge Ware suggested a "show cause" hearing might be necessary. During Mixon's meeting with the judge, the Attorney General's Office was contacted, and the use of the subpoena duces tecum to obtain the DNA sample was advocated. Judge Ware then signed an order authorizing the issuance of the subpoena.
Mixon testified that the subpoena was prepared in conjunction with the Warner and Mebruer cases. He noted that defendant had been caught on more than one occasion "walking, prowling, and peeping in windows" in the Oak Shadows subdivision in which both Ms. Warner and Ms. Mebruer had lived. The investigation indicated that Ms. Mebruer was attacked and abducted between 10:30 p.m. on Saturday, August 18, 1998 and 2:30 a.m. on August 19, 1998. During that time frame, defendant admitted to driving a route that would have taken him past Ms. Mebruer's Zachary subdivision; however, Mixon acknowledged that this route was the shortest route for defendant to follow to reach his destination. As to the fact that defendant was not in custody on the dates of the Warner and Mebruer attacks, Mixon further acknowledged that thousands of other people were not in jail on those dates. Mixon also testified as to the information received from the CS. According to Mixon, the CS stated that he had gone with defendant to defendant's home a night or two after Randi Mebruer's disappearance, that the defendant went into the back of the house, but did not turn on the lights. When he returned to the vehicle, the CS saw the defendant put a revolver in the console of his truck. The defendant told the CS that the Zachary police were harassing him about a missing white woman from Zachary.[1]
*976 At the conclusion of the hearing, the judge denied the motion to suppress. The judge found that the subpoena was essentially a search warrant and that the motion for the subpoena provided sufficient facts to establish probable cause. Defendant subsequently filed an application for supervisory writs, which was denied. State v. Lee, XXXX-XXXX (La.App. 1 Cir. 7/16/04) (unpublished), writ denied, XXXX-XXXX (La.7/30/04), 877 So.2d 997.
In this appeal, defendant contends that the swabbing for his DNA sample was a warrantless search and seizure and did not fall within one of the exceptions for the warrant requirement. He further argues that the subpoena duces tecum was an improper vehicle to obtain his DNA, and the motion for the subpoena did not provide the necessary probable cause for the seizure.
As to the use of the subpoena to obtain the sample, defendant cites jurisprudence as support for his argument that his Fifth Amendment rights were violated. The state responds that the subpoena duces tecum was a valid means to obtain defendant's DNA sample, and like an affidavit supporting a search warrant, the motion was reviewed by a judge before the subpoena was issued.[2] The state argues a neutral and detached reviewing judge made a determination that probable cause existed to obtain the sample.
Louisiana Code of Criminal Procedure article 66 provides for the issuance of a subpoena and subpoena duces tecum on the basis of reasonable grounds:[3]
A. Upon written motion of the attorney general or district attorney setting forth reasonable grounds therefor, the court may order the clerk to issue subpoenas directed to the persons named in the motion, ordering them to appear at a time and place designated in the order for questioning by the attorney general or district attorney respectively, concerning any offense under investigation by him. The court may also order the issuance of a subpoena duces tecum. Service of a subpoena or subpoena duces tecum issued pursuant to this Article upon motion of the attorney general may be made by any commissioned investigator *977 from the attorney general's office, or in conformity with Article 734 of this Code.
B. The contumacious failure or refusal of the person subpoenaed to appear is punishable as a contempt of court.
C. The attorney general or district attorney, respectively, may determine who shall be present during the examination and may order all persons excluded, except counsel for the person subpoenaed.
Defendant cites Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), in which the reviewing court determined that a subpoena duces tecum issued by the district attorney's office under a state statute did not justify a warrantless search and seizure and conferred no right to seize the property referred to in the subpoena. In Mancusi, a union official instituted a habeas corpus proceeding, arguing that evidence received against him in the state prosecution had been seized in violation of his Fourth Amendment rights. The Supreme Court found that the search of the union office without a warrant, but with a subpoena duces tecum, was a prohibited, unreasonable search. The subpoena did not qualify as a valid search warrant under the Fourth Amendment because it was issued by the District Attorney himself and thus omitted the indispensable condition that the inferences from the facts of the complaint be drawn by a neutral and detached magistrate instead of law enforcement officers. Mancusi, 392 U.S. at 371, 88 S.Ct. at 2125.
Mancusi is distinguishable from the instant case. Although both cases involved the initiation of a subpoena duces tecum by the prosecuting entity, in this case a judge reviewed the facts presented before the subpoena was ordered. The instant situation is unlike Mancusi, where no review by a judge was involved.
Defendant further contends that the information from the CS in the motion for the subpoena should not be considered in determining probable cause, because the motion failed to provide a basis for the reliability of the informant. He further argues that if the information from the CS were excised, the motion fails to provide probable cause.
The CS, identified at the Motion to Suppress hearing as Leroy Shorts, recalled seeing defendant around midnight "a night or two" after Mebruer's disappearance. During that meeting, defendant had a handgun in his truck and told Shorts that Zachary police were harassing him about a missing woman from Zachary. The next night, Shorts saw a television news report on Ms. Mebruer's disappearance and assumed that the defendant was talking about her.
However, the motion only indicates that the conversation occurred a "night or two" after the abduction and does not give a specific date. The testimony at the hearing does not clarify the exact date or the exact time that Zachary officers visited the defendant at his home on April 20 or when Shorts had the conversation with the defendant. A "night or two" could have put the conversation with Shorts after the Zachary officers talked with the defendant. Thus, the CS's information was helpful but not essential in establishing grounds for the issuance of the subpoena.
We note, however, that the motion submitted to Judge Ware was not under oath or affirmation as required by the Fourth Amendment, and we respectfully disagree with the trial court that the state's use of an LSA-C.Cr.P. art. 66 subpoena duces tecum to acquire a DNA sample from the *978 defendant was the equivalent of obtaining a search warrant.
Search warrants are authorized under the Fourth Amendment of the U.S. Constitution only upon a showing of probable cause "supported by Oath or affirmation" and particularly describing the place to be searched and the persons or things to be seized. Louisiana Code of Criminal Procedure article 162 thus provides, "A search warrant may issue only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts establishing the cause for issuance of the warrant." In contrast, an LSA-C.Cr.P. art. 66 subpoena is issued upon the motion of the attorney general or district attorney; no sworn statement is required.[4] The information presented to obtain the court order in this case was not supported by oath or affirmation. Thus the requirements for a warrant were not met.
Because the validity of the use of an LSA-C.Cr.P. art. 66 subpoena duces tecum to acquire a DNA sample appears to be a case of first impression in Louisiana, we adopt the rationale set forth in In re Shabazz, 200 F.Supp.2d 578, 581 (D.S.C. 2002). Although Shabazz involved a subpoena duces tecum issued by a grand jury, we find the reasoning employed by that court in finding the subpoena a valid means of obtaining a saliva sample equally applicable to an LSA-C.Cr.P. art. 66 subpoena duces tecum authorized by a trial court judge. In both instances an intervening authority (either a grand jury or a trial judge) passes on the reasonableness of the individualized suspicion that the subject of the subpoena has been involved in the alleged crime, thereby reducing the possibility of prosecutorial abuse.
The obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levels  the "seizure" of the "person" necessary to bring him into contact with government agents and the subsequent search for and seizure of the evidence. It is well-established that "a physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable." In re Shabazz 200 F.Supp.2d at 581, citing Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 616, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989) (drug and alcohol testing of railroad employees), Schmerber v. California, 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (blood test for alcohol), and Winston v. Lee, 470 U.S. 753, 760-61, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985) (order to compel surgical operation to remove a bullet). However, what a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection; accordingly, subpoenas compelling voice samples, handwriting samples, fingerprints, and hair samples are not "searches" and therefore do not implicate the Fourth Amendment. Id., citing U.S. v. Dionisio, 410 U.S. 1, 8, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), U.S. v. Mara, 410 U.S. *979 19, 21-22, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973), Davis v. Mississippi, 394 U.S. 721, 727, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), and In re Grand Jury Proceedings (Mills), 686 F.2d 135, 139 (3d Cir. 1982), cert. denied, 459 U.S. 1020, 103 S.Ct. 385, 74 L.Ed.2d 516 (1982). In contrast, acquiring scrapings below a defendant's fingernails, breathalyzer tests, and urine samples are "searches" within the meaning of the Fourth Amendment, as held in Cupp v. Murphy, 412 U.S. 291, 295, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), and Skinner, 489 U.S. at 613-14, 109 S.Ct. 1402, 103 L.Ed.2d 639. See In re Shabazz, 200 F.Supp.2d at 582.
Nevertheless, as pointed out by the Shabazz court, the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable. Thus, under certain circumstances, searches and seizures may be permissible under the Fourth Amendment "based on suspicions that, although `reasonable,' do not rise to the level of probable cause." In re Shabazz, 200 F.Supp.2d at 583, citing New Jersey v. T.L.O, 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), and Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Shabazz court reasoned that probable cause need not be a prerequisite for the issuance of a grand jury subpoena ordering a DNA saliva test because the very purpose of requesting the information is to ascertain whether probable cause exists.
The Shabazz court concluded that the privacy concerns that led the Supreme Court to require probable cause in other cases are not as pronounced with a saliva swab because it is not as intrusive as a blood test or a surgical bullet-removal procedure. Although the saliva swab involves a slight invasion of a person's bodily integrity, it is not a "surgical procedure" and therefore does not fall within Schmerber's threshold requirement of probable cause, so no showing of probable cause is needed before the issuance of a subpoena duces tecum requiring a saliva sample. In re Shabazz, 200 F.Supp.2d at 584.
The purpose of the saliva sample is plainly to advance the law enforcement objective of determining whether a suspect was involved in illegal physical contact with a victim. Therefore, although a showing of probable cause is not necessary, a subpoena duces tecum requiring a saliva swab must be based on reasonable individualized suspicion that a suspect was engaged in criminal wrongdoing. In re Shabazz, 200 F.Supp.2d at 584-85.
Another consideration is whether the "means and procedures employed" in taking the saliva sample were in themselves reasonable under the Fourth Amendment. To determine the reasonableness of procedures to obtain physical evidence, the "extent to which the procedure may threaten the safety or health of the individual" and the "extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity" should be "[w]eighed against . . . the community's interest in fairly and accurately determining guilt or innocence." A balancing of these factors in the Shabazz case led the court to conclude that the procedure used to obtain the saliva swab was plainly "reasonable" under the Fourth Amendment, because there was no evidence that the saliva swab presented any safety or health risk to the suspect, and secondly, because saliva sampling is a relatively minor intrusion into a suspect's interest in personal privacy and bodily integrity (the sample is obtained by simply swabbing the inside of the mouth and does not involve any risk of pain or embarrassment). The Shabazz court further reasoned that on the public interest side of the equation, the government has a clear *980 interest in obtaining DNA as highly probative evidence of identifying, or eliminating, a suspect. Further, a saliva swab is much less intrusive than the blood sample upheld by the Supreme Court in Schmerber. And it is easily distinguishable from the surgical procedure at issue in Winston, which was potentially dangerous and was of uncertain evidentiary value. Thus, the means and procedures used to obtain the saliva sample in Shabazz were found to be "reasonable" under the Fourth Amendment. In re Shabazz, 200 F.Supp.2d at 585.[5]
In the instant case, as previously stated, the subpoena duces tecum was sought in conjunction with the investigation of the murders of two Zachary women. In the motion prepared by the Attorney General's Office, seeking a subpoena duces tecum for the production of a DNA specimen from the defendant, the facts and circumstances of the kidnapping and/or murders of Randi Mebruer and Connie Warner were set forth. The motion further stated that the defendant had "previously been observed and later subsequently arrested by [Zachary Police Department] officers as a Peeping Tom in the Oak Shadows Subdivision where Mebruer and Warner resided." Immediately following the disappearance of Ms. Mebruer, the motion states that the defendant and his then-girlfriend were interviewed, and that the interview revealed that the defendant had driven past Ms. Mebruer's subdivision during the time that she was alleged to have been murdered. The motion further stated that defendant was considered by law enforcement as a suspect in that murder as well as in connection with the Baton Rouge area serial killer murders.
The defendant's criminal history was also detailed in the motion and included: a 1988 conviction for attempted unauthorized entry of an inhabited dwelling in St. Francisville; a 1993 conviction of simple burglary of an inhabited dwelling in Zachary; a 1996 plea of nolo contendere to charges of Peeping Tom and resisting arrest in Lake Charles; a 1998 conviction on two counts of Peeping Tom and resisting arrest in Zachary; a 1999 conviction of stalking; and a 2000 conviction of aggravated flight in St. Francisville following an altercation in a bar with his girlfriend and law enforcement, while on probation from a prior conviction. It was also stated in the motion that defendant was not incarcerated at the time that any of the following crimes were committed: the 1992 murder of Connie Warner; the 1998 disappearance of Randi Mebruer; nor the 2001 murder of Gina Wilson Green, the 2002 murder of Charlotte Murray Pace, the 2002 murder of Pam Kinamore, the 2002 murder of Trineisha Dene Colomb, or the 2003 murder of Carrie Yoder, whose murders were linked to a serial killer by DNA profiling. Further, the motion presented facts provided by a confidential informant, who indicated that he had accompanied the defendant to his St. Francisville house within one or two days of the disappearance of Ms. Mebruer, that defendant had complained that Zachary police officers were "harassing" him over a missing woman, *981 and that defendant had armed himself with a revolver.
Based on the facts stated in the motion for issuance of the subpoena duces tecum, we find that there was reasonable and sufficiently individualized suspicion that the defendant may have been involved in the Zachary crimes involving Ms. Warner and Ms. Mebruer to justify the issuance of the subpoena duces tecum. Whether or not the facts presented in the motion could also have sustained a finding of probable cause is irrelevant; the very purpose of the subpoena is to collect additional evidence sufficient to support probable cause, or to rule the defendant out as a suspect.
We further find that the means and procedures employed in obtaining the sample were not in themselves unreasonable. After obtaining the court order from the 20th Judicial District Court judge, investigator Danny Mixon, along with several other law enforcement officers, went to the defendant's residence and presented him with the subpoena. According to Mr. Mixon, the defendant did not object to the DNA testing. Mixon indicated that he accompanied defendant into his living room, where defendant sat down. Mixon then swabbed both the left and right sides of defendant's mouth. The defendant was not taken into custody at that time.
Based on the facts and circumstances presented in this case, we find no merit in defendant's challenge to the issuance and execution of the subpoena duces tecum ordering DNA sampling.[6] Accordingly, the trial court did not err in denying the Motion to Suppress the DNA evidence.

OTHER CRIMES EVIDENCE
In assignment of error number three, defendant contends that the trial court erred in permitting evidence of other crimes, wrongs, or acts to be introduced at trial.
The state filed a notice of intent to use evidence of other crimes, wrongs, and acts pursuant to LSA-C.E. art. 404(B) and State v. Prieur, 277 So.2d 126 (La.1973), to show "motive, opportunity, intent, preparation, plan and system, knowledge, and absence of mistake or accident" at trial. The written notice specifically refers to evidence of the killing of Trineisha Colomb on November 21, 2002 and the attempted rape and attempted murder of D.A. on July 9, 2002. The notice further refers to defendant's convictions for attempted unauthorized entry of an inhabited dwelling, simple burglary of an inhabited dwelling, and stalking, and arrests for aggravated burglary and "Peeping Tom."
Evidence concerning the crimes against Ms. Colomb and D.A. was presented at a Prieur hearing and at trial. Lt. Joseph Arthur Boyd, an investigator in the St. Martin Parish Sheriff's Office, testified at the hearing about the attempted rape and attempted murder of D.A. While cooking lunch, D.A. heard a knock at the front door of her mobile home. She opened the door and saw a man, later identified as the defendant, standing outside. He indicated that he was looking for a family named Montgomery and asked if she knew them. D.A. replied that she did not, and *982 the defendant asked to use her telephone and telephone book. D.A. took the items to the defendant on her porch and closed the door. She returned to the porch after the defendant used the telephone. He asked if her husband knew the family. When D.A. replied that her husband was not at home and that he did not know the family, defendant produced a knife, forced D.A. into her home, and demanded that she lead him to the bedroom. D.A. responded that they could stay in the living room. Defendant began choking the woman. He demanded that she remove her underwear and that she lie on the floor. D.A. complied and the defendant, who had removed his shorts and underwear, attempted to have intercourse, but was unable to obtain an erection. The defendant then started beating D.A. on her head and face. He also tried to strangle her with a telephone cord. When the defendant heard D.A.'s son drive up, he fled through the back door, stomping on the woman's stomach. D.A.'s son saw the defendant's vehicle and assumed it belonged to someone visiting his mother. Once inside, the son discovered his mother was injured and bleeding; the son ran outside and attempted to follow defendant's vehicle with his own vehicle, but the assailant was able to flee and the woman's son returned home to help his mother.
Detective Boyd testified that he and Lafayette Parish Sheriff's Office Detective Sonny Stutes began comparing information from D.A.'s case and that of Trineisha Dene Colomb, a serial killer victim. DNA found on Ms. Colomb's body matched that of the perpetrator in the serial killer cases in Baton Rouge. Detective Boyd stated that he was aware Ms. Colomb was the first African-American female victim linked to the serial killer and that he knew that D.A. was an African-American female. Detective Boyd asked the crime lab to retest the dress that D.A. was wearing at the time of her assault to look specifically for "contact DNA." D.A. had reported that her attacker had been sweating profusely. A partial profile of the DNA from perspiration on the dress indicated that the unknown serial killer could not be excluded as the source of the DNA found on D.A.'s dress.
With D.A.'s assistance, a computerized composite drawing of D.A.'s attacker was completed. Detective Boyd testified that the drawing resembled the defendant. Subsequently, Boyd had a meeting with the Serial Killer Task Force and a decision was made to release the drawing to the public. As a result, law enforcement officers received tips that led to the eventual arrest of the defendant for the murder of Geralyn DeSoto.[7]
Carolyn Booker, qualified as an expert in the field of forensic DNA analysis, also testified at the Prieur hearing. She performed DNA testing at the Acadiana Crime Lab. She testified D.A.'s dress was negative for semen, but had stains containing DNA. Booker indicated that the defendant, an African-American, could not be excluded as a contributor of the DNA, but that 99% of the African-American population would be excluded. At trial, Ms. Booker acknowledged that D.A.'s husband also could not be excluded as a minor contributor of the DNA found on her dress.
*983 Ms. Booker also conducted analysis of DNA from a vaginal swab of Ms. Colomb. The profile of the sperm cells from the swab matched defendant's known profile. She concluded with reasonable scientific certainty that defendant was the source of the male DNA and the sperm taken from Ms. Colomb's body. She testified that the probability of selecting a random individual with the same profile would be one in thirty trillion.
Gina Pineda was qualified as an expert in molecular biology and forensic DNA analysis and testified at the Prieur hearing and at trial. She was employed by Reliagene Lab, a private lab that performed Y-STR testing on fingernail clippings and a vaginal swab from Ms. DeSoto, the victim in the instant matter, and a vaginal swab from Ms. Colomb. This type of testing could not be done at the state crime lab.
Ms. Pineda explained that there are two types of DNA. The Y-STR test is conducted for DNA that is only on the male Y chromosome. Thus, the test attempts to find male DNA and was performed on the fingernail scrapings from Ms. DeSoto. This was done because the sample taken from Ms. DeSoto's fingernails was of poor quality and was "overwhelmed" with her female DNA. The DNA extracted from Ms. DeSoto's fingernail scrapings indicated a male contributor and revealed that defendant was a potential contributor of the DNA, while excluding 99.8% of the African-American population as potential donors. This figure was determined by using a random data base of 1605 individuals of African-American descent. Ms. Pineda acknowledged on cross-examination that when the Louisiana State Police Crime Lab tested the DNA found on Ms. DeSoto, a male chromosome was not detected. She further testified that there was more than one male donor of the DNA found under Ms. DeSoto's fingernails and that Ms. DeSoto's husband could not be excluded as a minor donor. Ms. Pineda admitted that paternal relatives of the defendant could not be excluded as potential donors of the DNA sample taken from Ms. DeSoto. She explained that the Y-STRs are inherited straight from the father, so a man will have the same Y-STR profile as his father, brother, and any individuals related through the paternal line.
The state argued that in order to counter the possibility that a male relative of the defendant actually perpetrated the crime, the Y-STR profile derived from the DNA sample taken from Ms. DeSoto was compared to and found to be consistent with Y-STR testing performed on a DNA sample from the Colomb case, where defendant was established with reasonable scientific certainty as the perpetrator, and the probability of selecting a random individual with the same profile was stated as one in thirty trillion. The match of male DNA profiles from the Colomb and DeSoto cases thus excluded the possibility of male relatives of the defendant as possible perpetrators of the DeSoto crime.
In addition to evidence from the D.A. and Colomb cases, "other acts" that the state sought to introduce were incidents that occurred on February 19, 1997; July 31, 1997; and August 19, 1999. Zachary Police Department Sergeant Roderick Ennis testified at the Prieur hearing and at trial that on February 19, 1997, at about 9:00 p.m., he was patrolling the Oak Shadows subdivision when he saw the defendant. Ennis, who lived in the subdivision, knew that the defendant did not live there. He stopped him and asked for his identification. Defendant stated he had left it in his vehicle, which had broken down. Defendant indicated that he was going to his girlfriend's house to use the telephone, but did not know the girlfriend's name or where she lived. Upon frisking the defendant, *984 Ennis found a knife in his front pocket. He noted that the defendant was wearing brown, western-type boots with a thick heel and had a pair of work gloves. When Ennis dropped the defendant off at his vehicle, Ennis noticed that it was a new truck that started immediately when defendant turned on the ignition. Sergeant Ennis testified that he did not arrest the defendant that night and that defendant did not commit a crime, but because there had been a rash of "Peeping Tom" incidents in the area and because both Connie Warner and Randi Mebruer had lived in the subdivision, he prepared a report.
Zachary Police Department Lt. David McDavid testified at the hearing that on July 31, 1997, he investigated two "Peeping Tom" complaints in the Oak Shadows subdivision in Zachary. The defendant was arrested in the area for these incidents, and Lt. McDavid later learned that the defendant had been seen in the same area in February of that year. Defendant was subsequently convicted of the "Peeping Tom" offenses.
On August 19, 1999, St. Francisville Police Department Officer Archie Lee took statements from three women who lived in the St. Francisville Square Apartments. Each of the women stated that the defendant had been stalking them in the apartment complex, and each identified defendant's picture in a photographic lineup. One of the women, Collette Walker Dwyer, indicated that the defendant had entered her apartment on two occasions without her consent. The defendant was arrested later that day and subsequently pled guilty to "Peeping Tom" offenses. At trial, Ms. Dwyer gave a more detailed description of her encounters with the defendant. During one of the incidents, the defendant walked up as she was unlocking her apartment door and walked with her into her apartment. He got himself something to drink, sat down, proceeded to question Ms. Dwyer and repeatedly asked her to go out with him. He also stated that he could rape her if he wanted. He only left when she walked out of the apartment and he followed her.
After the Prieur hearing, the trial court ruled it would allow the following other acts evidence to be introduced at trial: the murder of Colomb, the attempted rape and attempted murder of D.A., the February 19, 1997 stop of defendant while in Warner and Mebruer's subdivision including the discovery of a knife on defendant's person, the July 31, 1997 arrest in the same subdivision for two acts of "Peeping Tom", and the 1999 incidents when defendant approached a St. Francisville Square Apartments resident and a few days later was seen again at the same apartment complex and was convicted of "Peeping Tom" offenses. The trial judge concluded that each of the crimes or acts had been proven by clear and convincing evidence and could be used at trial to show knowledge, plan, and preparation and that the probative value of the evidence outweighed the prejudicial effect.
Defendant sought review of the trial court's ruling, and this court denied the writ. The supreme court denied defendant's writ seeking review. State v. Lee, XXXX-XXXX (La.App. 1 Cir. 7/16/04) (unpublished), writ denied, XXXX-XXXX (La.7/30/04), 877 So.2d 997.[8]
Article 404(B)(1) of the Code of Evidence provides:

*985 Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Generally, evidence of other crimes committed by the defendant is inadmissible due to the substantial risk of grave prejudice to the defendant. To admit "other crimes" evidence, the state must establish that there is an independent and relevant reason for doing so, i.e., to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or that it relates to conduct that constitutes an integral part of the act. The Louisiana Supreme Court has also held admissible evidence of other crimes exhibiting almost identical modus operandi or system, committed in close proximity in time and place. Evidence of other crimes, however, is not admissible simply to prove the bad character of the accused. Furthermore, the other crimes evidence must tend to prove a material fact genuinely at issue, and the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. State v. Millien, XXXX-XXXX, p. 10 (La.App. 1 Cir. 2/14/03), 845 So.2d 506, 513-14, citing State v. Tilley, 99-0569, p. 18 (La.7/6/00), 767 So.2d 6, 22, cert. denied, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001).
The procedure to be used when the state intends to offer evidence of other criminal offenses was formerly controlled by State v. Prieur. Prior to its repeal by 1995 La. Acts, No. 1300, § 2, LSA-C.E. art. 1103 provided that the notice requirements and clear and convincing evidence standard of Prieur and its progeny were not overruled by the Code of Evidence. Prieur dealt with LSA-R.S. 15:445 and LSA-R.S. 15:446, now-repealed statutes, which addressed the admissibility of other crimes evidence. Under Prieur, the state was required to give a defendant notice, both that evidence of other crimes would be offered against him, and upon which exception to the general exclusionary rule the state intended to rely. Additionally, the state had to prove by clear and convincing evidence that the defendant committed the other crimes. Millien, XXXX-XXXX at p. 10, 845 So.2d at 514.
1994 La. Acts, 3d Ex. Sess., No. 51 added LSA-C.E. art. 1104 and amended LSA-C.E. art. 404(B). Article 1104 provides that the burden of proof in pretrial Prieur hearings "shall be identical to the burden of proof required by Federal Rules of Evidence Article IV, Rule 404." The amendment to LSA-C.E. art. 404(B) inserted the language "provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes" into the article.
The burden of proof required by Federal Rules of Evidence Article IV, Rule 404, is satisfied upon a showing of sufficient evidence to support a finding by the jury that the defendant committed the other crime, wrong, or act. The Louisiana Supreme Court has yet to address the issue of the burden of proof required for the admission of other crimes evidence in light of the repeal of LSA-C.E. art. 1103 and *986 the addition of LSA-C.E. art. 1104. However, numerous Louisiana appellate courts, including this court, have held that the burden of proof is now less than "clear and convincing." Millien, XXXX-XXXX at p. 11, 845 So.2d at 514.
If the prosecution is using other crimes evidence to show "identity," the law requires that the facts of the cases be so "peculiarly distinctive" that one must logically say they are the work of the same person, but if the state wishes to use such evidence to show defendant's "intent," the standard is lower, and the state must only show that the crimes are similar. State v. Langley, 95-2029, p. 6 (La.App. 4 Cir. 9/4/96), 680 So.2d 717, 721, writ denied, 96-2357 (La.2/7/97), 688 So.2d 498. Where testimony shows that factual circumstances of prior acts and the crime charged are virtually identical, evidence of other crimes is corroborative of the victim's testimony and establishes a system or plan. State v. Lewis, 95-0769, p. 5 (La.App. 4 Cir. 1/10/97), 687 So.2d 1056, 1059, writ denied, 97-0328 (La.6/30/97), 696 So.2d 1004. Where identity is genuinely at issue, system evidence has relevance independent of a defendant's criminal propensity and should be admitted if it meets the other tests of admissibility. State v. Ester, 436 So.2d 543, 546 (La. 1983).
In State v. Bell, the Louisiana Supreme Court found that while there were some similarities between the two crimes, the prior crime was not "so distinctively similar to the charged crime (especially in time, place, and manner of commission) that one may reasonably infer that the same person was the perpetrator." Bell was charged with armed robbery and the state sought to introduce evidence of another robbery. The supreme court found that there were many differences between the two robberies, including the race of the perpetrators and the type of weapons used, and that the identity exception to inadmissibility must be limited to cases in which the crimes are genuinely distinctive. The crimes involved robberies of bars at night and occurred within two months of one another in Ascension Parish. The perpetrators in both cases were described as wearing dark hooded sweatshirts or Starter jackets. During both robberies, the perpetrators disengaged the telephone at the scene. The only evidence directly connecting Bell to the crime was the testimony of two co-perpetrators who were charged with participation in the robbery, but had not yet been tried. The supreme court found that the sufficiency of the evidence presented by the co-perpetrators easily would be upheld if the prosecutor had not introduced inadmissible evidence for the purpose of influencing the jury's determination of defendant's guilt and then emphasized in argument the role of that evidence in the guilt determination. The court found that it could not conclude with any confidence that the jury's guilty verdict was surely unattributable to the erroneous admission of evidence of a prior armed robbery committed by defendant, especially since the prosecutor exploited the inadmissible evidence in rebuttal closing argument. The supreme court found that this court concluded correctly that the other crimes evidence was erroneously admitted. A harmless error analysis[9] was *987 conducted, the conviction was reversed, and the case was remanded for a new trial. State v. Bell, 99-3278, pp. 4-8 (La.12/8/00), 776 So.2d 418, 421-23,
The balancing test of LSA-C.E. art. 403 is conducted if the other crimes evidence is admissible. Article 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
In the instant case, defendant argues that the only real issue at trial was the identity of the victim's assailant, and that the facts of the instant offense and the other crimes are not so distinctively similar that they meet the necessary standard to be introduced at trial. As to the other crimes involving Colomb and D.A., defendant argues that the use of the evidence about the DNA test results in those cases allowed the state to introduce those results during the DeSoto trial, and that this evidence highly impacted the jury, as prospective jurors had indicated in voir dire that DNA evidence was infallible. Defendant further argues that the facts presented as to each crime do not show that there were distinctive similarities; rather they were commonplace. Additionally, defendant contends that the other crimes evidence was not used for limited purposes as required, but to cast him as the serial killer suspected in numerous Baton Rouge murders. He contends that the state did not use this evidence for the stated purpose to show identity of the perpetrator through system or modus operandi.
The state argues that the Colomb and D.A. cases are similar to the DeSoto case because the defendant's DNA was found on each of the victims. This is a bootstrap argument. DNA evidence is not an "act" and cannot by itself constitute an act similar to the crime charged that would make evidence of that act admissible in the trial of the crime charged. Absent the requisite similarity between the crime charged and the other "acts," evidence of the other acts is not admissible at the trial of the crime charged. DNA evidence alone cannot bootstrap the other act into being "similar." DNA is a type of evidence, not a crime, wrong, or act.
Analysis of the three crimes at issue shows that while the DeSoto case and the D.A. case are distinctively similar, the Colomb case is not. While all three victims were in a violent bloody struggle and beaten in the head and face, scenarios unfortunately common to many murder and rape cases, here the similarities end. Ms. Colomb was raped, Mrs. DeSoto and D.A. were not. A knife was used in the DeSoto and D.A. crimes, but not in the Colomb case. Cordless phones were missing in DeSoto and D.A., but not Colomb. DeSoto and D.A. were attacked in their homes at midday, Colomb's body was found far from her house. There was evidence of a "stomp" in the DeSoto and D.A. cases, but not in Colomb. Telephone calls were placed from the homes of DeSoto and D.A., but not from that of Colomb.
We find that the facts of the instant case, when compared to the facts of the case of D.A., are so peculiarly distinctive that the evidence of the D.A. case, including DNA evidence, was properly admitted at trial. We cannot reach the same conclusion with respect to the evidence in the Colomb case. The cases are not distinctively *988 similar. Nor are we persuaded by the state's argument that the Colomb evidence was admissible to counter the possibility that one of the defendant's male relatives perpetrated the DeSoto crime. This end could have been accomplished by testing and comparing male DNA from a known sample of the defendant rather than comparing a sample of the defendant taken from the body of Ms. Colomb. Furthermore, D.A. identified defendant at trial as her attacker.
Likewise, the various Peeping Tom, stalking, and burglary/unauthorized entry crimes, wrongs, and acts should not have been admitted. While these acts are perhaps similar to each other, and tend to paint the defendant as a sexual predator, they are not similar to the DeSoto crime. This evidence was prejudicial character evidence meant to be excluded by Prieur and Article 404(B)(1) of the Code of Evidence.
The erroneous admission of other crimes, wrongs, or acts evidence is a trial error subject to harmless error analysis on appeal. State v. Johnson, 94-1379, pp. 16-17 (La.11/27/95), 664 So.2d 94, 101. The test for determining whether an error is harmless is whether the verdict actually rendered in this case "was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182(1993); Johnson, 94-1379 at p. 14, 664 So.2d at 100.
In the case at hand, we find that the other acts evidence erroneously admitted was harmless and that the defendant's conviction was surely unattributable to the error. The DNA evidence in the instant case showed a high probability that the defendant was the perpetrator, excluding as possible DNA contributors 99.8% of the African-American population, although not excluding defendant's paternal relatives or the victim's husband as a minor contributor. Furthermore, the DNA evidence from the D.A. case excluded 99.9 % of the African-American population, but the defendant and D.A.'s husband were not excluded. However, D.A. identified the defendant as her attacker. Other physical evidence also linked the defendant to the instant crime, including his proximity, a boot print, the knife wounds, and the telephone call from the victim's phone to defendant's former place of employment.

SUFFICIENCY OF THE EVIDENCE
In assignment of error number four, defendant argues that without the other crimes evidence, the remainder of the evidence introduced was insufficient to support the conviction. He contends that the remaining evidence (DNA analysis indicating a male member of his family was the perpetrator, a boot print at the scene of the murder possibly made by defendant's boot, that he traveled a route on the day of the murder that brought him within 200 yards of the victim's home, and that defendant carried a knife consistent with the type of knife used to kill the victim) is insufficient to prove he killed the victim.
The state argues that the evidence, particularly the DNA evidence found under the victim's fingernails, places defendant at the murder scene and indicates he was the killer.
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also LSA-C.Cr.P. art. 821; State v. Wright, 98-0601, p. 2 (La.App. 1 Cir. 2/19/99), 730 *989 So.2d 485, 486, writ denied, 99-0802 (La.10/29/99), 748 So.2d 1157, writ denied, XXXX-XXXX (La.11/17/00), 773 So.2d 732.
When analyzing circumstantial evidence, LSA-R.S. 15:438 provides: "[A]ssuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This statutory test is not a purely separate one from the Jackson constitutional sufficiency standard. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Shanks, 97-1855, pp. 3-4 (La.App. 1 Cir. 6/29/98), 715 So.2d 157, 159. The reviewing court is required to evaluate the circumstantial evidence in the light most favorable to the prosecution and determine if any alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Fisher, 628 So.2d 1136, 1141 (La.App. 1 Cir.1993), writs denied, 94-0226 and 94-0321 (La.5/20/94), 637 So.2d 474 and 476. As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. State v. Johnson, 98-1407, p. 6 (La.App. 1 Cir. 4/1/99), 734 So.2d 800, 805, writ denied, 99-1386 (La.10/1/99), 748 So.2d 439.
There were no eyewitnesses to directly connect defendant with the murder, and the evidence presented at trial was circumstantial. The evidence showed that a boot print at the scene of the murder matched a print made from one of defendant's boots, and that defendant carried on his person a knife consistent with the type of knife that could have made the wounds the victim received. The state also presented evidence showing it was possible that on the day of the murder the defendant, on his way to get a paycheck from his former employer, traveled a route within 200 yards of the victim's home, and that a call placed from the victim's telephone within the estimated time of the murder was made to a number assigned to an area in a plant where defendant had previously worked. Other evidence included the results of analysis of DNA obtained from the victim's fingernails that could not exclude defendant and his paternal relatives as a source, but could exclude 99.8% of the African-American population. Additional evidence showed that DNA test results obtained from the crimes involving D.A. indicated the defendant could not be excluded as the perpetrator in the D.A. case. Additionally, D.A. provided a police sketch of her attacker to law enforcement, and it resembled the defendant. She identified him in a photographic lineup, and she identified him as her attacker at trial.
Therefore, after a thorough review of the record and the evidence contained therein, we are convinced that a rational trier of fact could have concluded beyond a reasonable doubt that the evidence was sufficient to exclude every reasonable hypothesis of innocence, to negate any reasonable probability of misidentification, and to prove that defendant was the perpetrator.
This assignment of error lacks merit.

CHANGE OF VENUE
In assignment of error number five, defendant argues that the trial court erred in denying his motion to change venue, which was based upon the failure to obtain a fair and impartial jury due to the effect of pretrial publicity on the venire. Specifically, defendant argues that misinformation about the crime and extensive media coverage saturated the community and inflamed feelings against him. He contends that every one of the prospective jurors questioned, including the seated jurors, *990 was familiar with the facts of the case and his reputation as the suspected serial killer.
The state responds that the exposure to media coverage is not the criteria for finding the venire was tainted. Rather, it is the impact of the exposure that is reviewed to determine if the community was prejudiced and an impartial and fair trial could not be held in the place of original venue.
The record shows the trial court deferred its ruling on the motion for change of venue until after the venire had been questioned about its knowledge of the case. Several times during voir dire defense counsel reiterated the motion, which the trial judge denied. Near the end of voir dire, defense counsel reurged his motion to change venue. The judge denied the motion and stated, in pertinent part:
[T]o expect people not to know anything about it [the case] would be absurd. I don't think there's a square inch of ground in this state where people have not heard of this case, I don't believe it. I just don't believe it.
The ultimate issue for determination and what Mr. Lee is entitled to is a right to a trial by fair and impartial jurors, that's what he's entitled to, that's what the law grants him.
A defendant is guaranteed an impartial jury and a fair trial. LSA-Const. art. I, § 16; State v. Brown, 496 So.2d 261, 263 (La.1986); State v. Bell, 315 So.2d 307, 309 (La.1975). To accomplish this end, the law provides for a change of venue when a defendant establishes he will be unable to obtain an impartial jury or a fair trial at the place of original venue. State v. Bell, 315 So.2d at 309.
Louisiana Code of Criminal Procedure article 622 provides, in pertinent part:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue, the trial court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial. State v. Hoffman, 98-3118, p. 6 (La. 4/11/00), 768 So.2d 542, 552, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000).
In unusual circumstances, prejudice against the defendant may be presumed. Unfairness of a constitutional magnitude will be presumed in the presence of a trial atmosphere that is utterly corrupted by press coverage or that is entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob. See State v. David, 425 So.2d 1241, 1246 (La.1983). Otherwise, the defendant bears the burden of showing actual prejudice. State v. Vaccaro, 411 So.2d 415, 423-24 (La.1982).
Whether a defendant has made the requisite showing of actual prejudice is a question addressed to the trial court's sound discretion, which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion. Several factors are pertinent in determining whether actual prejudice exists, rendering a change in venue necessary: (1) the nature of pretrial publicity and the degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the *991 publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. State v. Manning, XXXX-XXXX, pp. 7-9 (La.10/19/04), 885 So.2d 1044, 1061-62, cert denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005).
In the present case, a review of these factors demonstrates the trial court did not abuse its discretion when it denied the motion. As to the factor of pretrial publicity and the degree it circulated in the community, defendant submitted, in the form of a proffer, approximately six local newspaper articles published a few days before and during voir dire. As acknowledged by the trial judge in one of his rulings on the motion to change venue, the voir dire revealed that almost all the prospective jurors examined responded they had some exposure to the instant case or the serial killer cases.
As noted earlier, defendant is not entitled to a jury entirely ignorant of his case and cannot prevail merely by showing a general level of public awareness about the crime. In several cases, high exposure to publicity before the trial did not result in reversible error for the failure to change venue. In State v. Frank, 99-0553, pp. 16-17 (La.1/17/01), 803 So.2d 1, 16-17, 110 out of 113 venire members (97%) had been exposed to some publicity surrounding the case, and 89% of the prospective jurors indicated they had been exposed to information about the case on more than one occasion or from multiple sources. See also Hoffman, 98-3118 at p. 9, 768 So.2d at 555 (72 out of 90 prospective jurors (80%) had awareness of the case before trial); State v. Connolly, 96-1680, p. 5 (La.7/1/97), 700 So.2d 810, 815 (although 120 out of 139 potential jurors (86.33%) possessed some knowledge about the crime, most had only a vague recollection of the surrounding facts).
As to the connection of government officials with the release of the publicity, some of the newspaper articles during voir dire included comments made by the trial judge likening the use of juror challenges to a game of chess. Most of the pretrial articles do not include comments by government officials, although one article includes a discussion of the evidence by the prosecutors. In the newspaper on that same day are extensive articles about the victim and about the defendant, his upbringing, his past criminal history, and facts about the other alleged serial killer cases.
Regarding the factor of the length of time between the publicity and the trial, the newspaper articles proffered by defendant indicate that the news coverage was extensive just prior to the start of voir dire and was ongoing during the trial. Although not documented by defendant, other areas in the record indicate there was extensive publicity during the investigation of the serial killer murders, at the time defendant was arrested for the murders, and at the time the victim in this case was alleged to be one of the victims of the serial killer. However, during voir dire, the trial judge repeatedly admonished the venire to avoid media coverage of the case. There is nothing in the record to indicate that any of the prospective jurors did not abide by the trial court's admonishment. Without doubt the severity and notoriety of the offense and the other crimes to be established at trial were significant and extensive. The victim in the instant offense was alleged to have been one of more than five victims of the same offender. As noted by the trial judge, there was *992 doubt that anyone in the state would not have heard of the serial killer cases.
The area from which the jury was drawn was in West Baton Rouge Parish, where the offense occurred. West Baton Rouge Parish is separated by the Mississippi River from East Baton Rouge Parish, where most of the other alleged serial killer crimes were committed. However, both parishes are within the coverage of the same print and electronic news media.
As shown by the record of the voir dire, many persons in the community were affected by the numerous murders of women by the alleged serial killer. Many people were more cautious during the time the murders were being committed. Some members of the community altered their lifestyles and obtained guns or mace to protect themselves. Among the prospective jurors questioned, the majority did not make significant changes in their lifestyle. However, a number of the venire indicated they became more relaxed and less fearful after the defendant was in custody and identified by law enforcement officials as the serial killer.
It does not appear that there were other factors that affected the candor and veracity of the prospective jurors on voir dire. Instead, as noted by the trial judge, the prospective jurors appeared to be quite truthful when questioned. Some prospective jurors indicated they had familiarity with the case or had heard opinions about defendant's guilt or innocence from sources other than the media, presumably from discussions with friends or family, but almost all indicated they were able to set aside this information. Although there may have been a sense in the community that the defendant was the killer in the instant case and in the serial killer cases, the record does not indicate that this opinion prevented defendant from receiving a fair trial. Most of the prospective jurors and all of the seated jurors with an opinion about the defendant's guilt or innocence stated they were able to put aside this opinion and base their verdict only upon the evidence introduced at trial.
Based upon our review of the factors and the record before us, we find no abuse of the trial court's discretion in denying defendant's motion for change of venue.

CHALLENGES FOR CAUSE
In assignment of error number six, the defendant argues that the trial court erred by repeatedly denying his challenges for cause.
An accused in a criminal case is constitutionally entitled to a full and complete voir dire examination and to the exercise of peremptory challenges. LSA-Const. art. I, § 17(A). The purpose of voir dire examination is to determine prospective jurors' qualifications by testing their competency and impartiality and discovering bases for the intelligent exercise of cause and peremptory challenges. State v. Robertson, 97-0177, p. 18 (La.3/4/98), 712 So.2d 8, 25, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998).
Louisiana Code of Criminal Procedure article 797 provides for challenges of prospective jurors for cause as follows:
The state or the defendant may challenge a juror for cause on the ground that:
(1) The juror lacks a qualification required by law;
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial *993 verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court; or
(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.
A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice, or inability to render judgment according to law may be reasonably implied. State v. Martin, 558 So.2d 654, 658 (La.App. 1 Cir.), writ denied, 564 So.2d 318 (La.1990). A trial judge is vested with discretion in ruling on challenges for cause, and only where it appears upon review of the voir dire examination as a whole that the judge's exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the accused, will this court reverse the ruling of the trial judge. See Martin, 558 So.2d at 658.
Defendant contends that the trial court erred in denying the challenges for cause as to all the seated jurors, except for Mr. LeBlanc and Mr. Anderson, because each juror was partial, unable to accept the law, or biased due to adverse pretrial publicity. He also contends that prospective jurors Wendy Knapps, Steven Cope, and Patricia Acosta were biased. None of these three were chosen for the jury.
As to defendant's general allegation concerning the seated jurors, without any specific argument or facts related to any one particular juror, the state responds that it is "unable to specifically refute such a baseless allegation." We agree that defendant's assignment of error as to the ten seated jurors lacks specificity. Nevertheless, we have reviewed the entire voir dire, including that of the seated jurors, and find no error.
The defendant does make specific allegations regarding three prospective jurors who were unsuccessfully challenged for cause. Specifically, as to prospective juror Wendy Knapps, the state responds that Ms. Knapps assured the trial court that she could put aside her previously formed opinion on the issue of guilt or innocence and apply the law as given by the court. During voir dire, Ms. Knapps indicated she could be fair and would rely on the evidence in determining her verdict. Later during questioning, Ms. Knapps indicated that she had seen television news reports about the defendant. Once she learned that defendant was arrested, she stopped being concerned about her safety. Ms. Knapps further stated that, although she had talked to her co-workers about the case, she did not form nor express an opinion about defendant's guilt or innocence.
There is no indication that Ms. Knapps was biased or prejudiced against defendant or that she could not follow the law as given to her by the trial judge. She did not indicate that she had developed an opinion; she merely had been concerned about her safety when hearing news reports of homicides in the general area. Thus, the judge's ruling denying the challenge for cause as to Ms. Knapps was not an abuse of discretion.
Steven Cope's answers to initial voir dire questioning indicated that he could put aside any opinion he may have had and *994 follow the law as explained by the trial judge. Mr. Cope further indicated that he had heard television news reports and read newspaper accounts regarding defendant as far back as one and one-half years before he was called for jury duty. He recalled hearing that defendant's DNA matched that of the killer and that he believed defendant was guilty. Although he initially commented that he would not want to have himself on the jury if he were being tried, Mr. Cope later stated he hoped he could put aside his belief about defendant. Mr. Cope followed up his answers by stating he could put aside any opinion and had not understood the question at first. The pertinent part of the colloquy during voir dire is as follows:
Q. At some point did you form an opinion in your mind as to whether you thought he was guilty or innocent?
A. MR. COPE: As I said earlier, yes, that he was guilty.
Q. And when did you form that opinion?
A. MR. COPE: Probably at the beginning of the  whenever it came down that they caught the suspected serial killer, that the DNA matched, and. . . .
Q. So at that point you started thinking he was probably guilty?
A. Right, right.
Q. Did anything happen during those, all the time he's been in jail, from whenever you first heard about it, that changed your mind?
A. MR. COPE: Not really.
Q. You've heard nothing to change your opinion?
A. MR. COPE: Not particularly, no, sir.
Q. So you still hold that opinion?
A. MR. COPE: I can put it aside, but yeah, I still hold that opinion.
Q. I understand. You still are going to start with the opinion that Mr. Lee is guilty?
A. MR. COPE: Correct.
Q. So somehow you've got to get rid of that opinion.
A. MR. COPE: Well, I can put it aside.
Q. How are you going to put it aside?
A. MR. COPE: If I was sitting in that chair right now and somebody was accusing me and I know I'm innocent, I would expect them to put it aside.
Q. Well, let me ask you this: knowing what you know in your mind and knowing that today as you sit here you have an opinion that you think he's guilty, let's switch it and you were sitting in that chair and you were accused, would you want someone like you?
A. MR. COPE: No, I wouldn't.
Q. Why not?
A. MR. COPE: Well, hopefully I would have it in the back of my mind that you think you could put everything aside and start off clean 
Q. Good question, hopefully.
A. MR. COPE: Hopefully.
Q. But you're not sure?
A. MR. COPE: I could put it aside, so yes, I would say I want me on the  as a juror.
Q. Okay. First, you said you didn't 
A. MR. COPE: I didn't understand, I understand now.
Q. But you've changed your mind and you would want you?
A. MR. COPE: Right.
Q. What did you do different once you heard about Mr. Lee and these murders?

*995 A. MR. COPE: Do differently as in?
Q. I mean like 
A. MR. COPE: Nothing.
Q. Did you have a fiancee or wife at the time?
A. MR. COPE: It didn't directly involve us as in everyday living. We didn't go out and get a gun or mace or anything like that.
Q. You didn't?
A. MR. COPE: Oh, no, I wasn't worried about that.
Q. Did you check on your fiancee more?
A. MR. COPE: Not particularly.
Q. Not at all?
A. MR. COPE: I think she can handle herself.
Q. Does she carry a gun?
A. MR. COPE: No.
Q. And if she were out at night in the Baton Rouge area?
A. MR. COPE: I would be worried, but 
Q. You were worried then?
A. MR. COPE: I would be worried, yeah. But as any day, even before that, I didn't have my wife or a fiancee then, but you know, my mother, my brother, and my sister or something like that.
Q. And when Mr. Lee was arrested did you feel relieved?
A. MR. COPE: I could say yeah, I felt a little bit more relieved.
After reviewing the answers as a whole, it appears that Mr. Cope indicated that he was able to be an impartial juror and that the trial court did not abuse its discretion in denying defendant's challenge for cause as to Mr. Cope.
Patricia Acosta stated she would have to "see the evidence and weigh it" before rendering a verdict. She further indicated that if defendant exercised his right not to testify, she would not hold that decision against him. Ms. Acosta admitted seeing media coverage on television and seeing pictures of women who were missing and alleged murder victims of the serial killer. However, she did not hear any opinion of defendant's guilt or innocence and she had not formed an opinion herself. She reiterated that she would not allow the media coverage to interfere with her decision and would base her verdict only on the evidence presented at trial. She could be fair and put aside anything heard about the case.
The record shows that Ms. Acosta consistently indicated that she could put aside any information she had received about defendant outside of trial, could follow the law in deciding the case, and could be a fair and impartial juror. The trial court's denial of the challenge for cause as to Ms. Acosta was not error.
This assignment of error lacks merit.[10]

INTRODUCTION OF VIDEOTAPE OF CRIME SCENE
In assignment of error number seven, defendant contends that the trial court erred in allowing the jury to be shown a videotape of the crime scene. He argues the video was gruesome and unnecessary to the state's case because the *996 jury also had still photographs of the crime scene to view. The state responds that the videotape did not unfairly prejudice the defendant. Instead, the videotape depicted the crime scene as it was found, corroborated other evidence, and illustrated facts in the case.
Even when the cause of death is not at issue, the state is entitled to the moral force of its evidence and postmortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, location, or placement of wounds, as well as to provide positive identification of the victim.
The issue of admissibility of a videotape is similar to the issue of the admissibility of still photographs; a videotape, like a photograph, may be admissible to corroborate other testimony in a case, such as: location of the body, manner of death, specific intent to kill, cause of death, and the number, location, and severity of wounds. State v. Davis, 92-1623, pp. 23-24 (La.5/23/94), 637 So.2d 1012, 1026, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994); State v. Pooler, 96-1794, pp. 42-43 (La.App. 1 Cir. 5/9/97), 696 So.2d 22, 50, writ denied, 97-1470 (La.11/14/97), 703 So.2d 1288. Photographs that illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place, or thing depicted, are generally admissible, provided their probative value outweighs any prejudicial effect. The fact that the photographs are gruesome does not of itself render the photographs inadmissible. Merely because the videotape may be "cumulative" evidence does not render the tape inadmissible. A trial court's ruling on the admissibility of such evidence will be disturbed only if the prejudicial effect of the evidence outweighs its probative value. LSA-C.E. art. 403; Pooler, 96-1794 at p. 43, 696 So.2d at 51.
As in Pooler, the videotape in this case depicts the scene of the crime as the police officers found it. The tape shows the doorway of the victim's residence, the layout of her trailer including the kitchen/living room where she was confronted, the hall/laundry area leading to the bedroom, and bedroom where the victim's body was found. The videotape also shows the victim's body on the floor of the bedroom and the blood spatter. These matters corroborate testimony and illustrate the facts in the case. The majority of the tape does not focus on the victim's body.
The probative value of this evidence outweighed any prejudicial effect. The videotape is no more gruesome than the still pictures introduced at trial and fully depicts the trailer's layout and the blood spatter, which the still pictures were unable to do. Accordingly, we find that the trial court correctly allowed this evidence to be admitted over the defendant's objection.

MOTION FOR NEW TRIAL AND MOTION TO QUASH INDICTMENT
In assignment of error number eight, defendant argues that the trial court erred in denying his Motion for New Trial and/or Motion to Quash. Defendant argues that he filed his motion after trial when he discovered that neither of the two assistant district attorneys who prosecuted the case, Mr. Tony Clayton and Ms. Becky Chustz, was competent to represent the state. Specifically, defendant contends that because there was no oath of office on file with the Secretary of State, neither assistant had the authority to prosecute the case against him or the authority to conduct the grand jury proceedings. Thus, he should receive a new trial.
*997 The motion for new trial is based upon the supposition that injustice has been done the defendant, and unless such is shown to have been the case, the motion shall be denied, no matter upon what allegations it is grounded. LSA-C.Cr.P. art. 851. In order to obtain a new trial based on newly discovered evidence, the defendant has the burden of showing: (1) the new evidence was discovered after trial, (2) the failure to discover the evidence at the time of trial was not caused by lack of diligence, (3) the evidence is material to the issues at trial, and (4) the evidence is of such a nature that it probably would have produced a different verdict. State v. Smith, 96-0961, p. 7 (La. App. 1 Cir. 6/20/97), 697 So.2d 39, 43.
The motion alleges that the new evidence (that the prosecutors did not have the authority to act as assistant district attorneys) was discovered after the trial ended. At the hearing on the motion, there was a stipulation between defendant and the state that the assistant district attorneys were lawyers in good standing and employees of the Office of the District Attorney. Witnesses who testified included the District Attorneys of East Baton Rouge Parish and West Baton Rouge Parish, the two assistant district attorneys, Tony Clayton and Becky Chustz, and an employee of the Secretary of State.
The transcript of the hearing indicates that Mr. Richard Ward, Jr., the District Attorney for the 18th Judicial District Court, identified Mr. Clayton's written oath of office. He had no independent recollection of the signing of the document on September 16, 2003, but was adamant that he did not sign the oath on August 6, 2004, the date it was faxed to the Secretary of State's Office. He recalled that defendant's trial was ongoing on the August date and that he had not signed any such document at that time.
During Mr. Ward's testimony, the trial judge noted that the parties stipulated that the filing of the oath with the Secretary of State took place on August 6, 2004. Mr. Ward further testified that at the beginning of the investigation and handling of the instant criminal proceeding, the assistant district attorneys at issue were employed by him and had the authority to prosecute the case.
Mr. Clayton testified that he signed the oath of office on September 16, 2003. He also recalled being administered the oath of office by Mr. Ward. Deborah Turner, the supervisor of the Secretary of State's Commissions Division, testified that she saw two letters from Mr. Ward addressed to Governor Mike Foster. One was dated September 16, 2003, appointing Mr. Clayton as an assistant district attorney and requesting a commission and oath of office. Her office received these letters on September 17 and September 19, 2003. A notation on the bottom of the letters indicates that the commission, oath of office, identification card, and Code of Governmental Ethics were mailed from the Secretary of State's office on October 7, 2003.
Ms. Turner also verified that Ms. Chustz had received documents from the Secretary of State that would not have been issued unless her office had received an oath and a request for a commission. Although a search for an oath had proved fruitless, Ms. Turner testified that after six years on file the relevant documents might well have been transferred to archives.
It thus seems probable that Mr. Clayton and Ms. Chustz executed oaths. However, even absent oaths, they were clearly authorized to prosecute the case under Article 63 of the Code of Criminal Procedure[11] *998 by District Attorney Ward, who tried the case with them.
In denying the motion for new trial, the trial judge questioned whether any injustice had been done to defendant. The judge also cited Thibodeaux v. Comeaux, 243 La. 468, 488-89, 145 So.2d 1, 8 (1962), cert. denied, 372 U.S. 914, 83 S.Ct. 729, 9 L.Ed.2d 721 (1963), which recognized that a public officer's failure to qualify under the law does not vitiate his acts if he fulfills the requirements of a de facto officer. Thibodeaux indicates that a person is a de facto officer if he exercises the duties of his office under color of a valid appointment, but fails to conform to some requirement, such as taking an oath. Herein, the trial judge found that there was no question that the District Attorney appointed Mr. Clayton and Ms. Chustz as his assistants.
After a careful review of the record, we find no abuse of discretion in the trial court's denial of the defendant's motion. First, defendant did not allege in his motion or sustain his burden of showing that the newly discovered evidence would have resulted in a different verdict. Second, as argued by the state at the hearing, defendant did not show any prejudice that resulted to him by the prosecutors' possible failure to have filed their oaths of office with the Secretary of State. Last, we agree with the trial court that it is clear that both of the assistant district attorneys were appointed to their positions by Mr. Ward, and even if they did not fulfill all the requirements, such as the filing of an oath of office, they would have acted in a de facto capacity as prosecutors.
This assignment of error lacks merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Mixon's testimony at trial differs slightly from the information contained in the "Motion for Issuance of Subpoena Duces Tecum." The motion represents that the CS saw the revolver when he first entered the defendant's vehicle and does not describe as "white" the missing woman from Zachary.
[2] The state also notes that in order to confirm the DNA results linking defendant to the murder of Geralyn DeSoto, after defendant was in custody the state obtained another sample by filing a motion to compel a DNA sample.
[3] Several Louisiana statutes provide authority for state intrusion based upon "reasonable grounds." LSA-R.S. 17:416.3 provides for the search of students' persons, desks, lockers, and other areas based upon reasonable grounds to suspect that the search will reveal evidence that the student has violated the law, a school rule, or a school board policy. LSA-R.S. 28:53 provides that a police officer may take a person into protective custody and transport him to a treatment facility for a medical evaluation when, as a result of his personal observation, the officer has reasonable grounds to believe the person is a proper subject for involuntary admission to a treatment facility because the person is acting in a manner dangerous to himself or dangerous to others, is gravely disabled, and is in need of immediate hospitalization to protect such a person or others from physical harm. LSA-R.S. 32:661(A)(1) provides for the implied consent to chemical testing for blood-alcohol content of persons operating motor vehicles in this state. LSA-R.S. 32:661(A)(2)(a) provides that the test shall be administered at the direction of a law enforcement officer having reasonable grounds to believe the person has been driving while under the influence of alcohol or a controlled dangerous substance. LSA-Ch. Code art. 621 allows a police officer to take a child into custody without a court order if he has reasonable grounds to believe that the child's surroundings are such as to endanger his welfare and immediate removal appears to be necessary for his protection.
[4] Although not applicable to the instant proceeding, we note Article 163.1 was added to the Louisiana Code of Criminal Procedure by 2005 La. Acts, No. 38, § 1, and provides:

A. A judge may issue a search warrant authorizing the search of a person for bodily samples to obtain deoxyribonucleic acid (DNA) or other bodily samples.
B. The warrant may be executed any place the person is found and shall be directed to any peace officer who shall obtain and distribute the bodily samples as directed in the warrant.
C. A warrant authorizing the search of a person for bodily samples remains in effect for one hundred eighty days after its issuance.
[5] Other decisions are in accord with Shabazz, upholding use of a subpoena to obtain DNA evidence collected via a saliva sample and/or buccal swab following a reasonableness review. See U.S. v. Garcia-Ortiz, (D.P.R.12/23/05) (2005 WL 3533322); People v. Watson, 214 Ill.2d 271, 292 Ill.Dec. 1, 825 N.E.2d 257 (1/21/05), cert. denied, 546 U.S. 1139, 126 S.Ct. 1141, 163 L.Ed.2d 1003 (2006); U.S. v. Swanson, 155 F.Supp.2d 992 (C.D.Ill.7/11/01); In re Nontestimonial Identification Order Directed to R.H., 171 Vt. 227, 762 A.2d 1239 (Vt.2000); In re Grand Jury Proceedings Involving Vickers, 38 F.Supp.2d 159 (D.N.H.12/4/98).
[6] Another factor we consider is that grand jury proceedings are conducted in secrecy, not only to facilitate investigations, but to protect innocent persons. Code of Criminal Procedure article 66 seems to imply production pursuant to a subpoena duces tecum "at a time and place designated in the order" for the person involved to appear. Presumably the subject of the subpoena would thus have an opportunity to obtain counsel and attempt to quash or contest the subpoena, or to seek a protective order. However, the order prepared in the instant case provided for the DNA sample to be provided "instanter." Fortunately, it also provided for the results to be sealed.
[7] The chronology appears as follows: the composite drawing when released to the public led to interest in defendant. He was then identified through DNA as the common perpetrator of the five known serial murders. D.A. identified defendant in a photographic line-up and he was arrested for the attack on her. Subsequent DNA analysis linked defendant to Geralyn DeSoto.
[8] In the writ action by this court, Judge McDonald concurred in part and dissented in part.
[9] The supreme court concluded that erroneous admission of other crimes evidence is subject to harmless error analysis under the standard set forth in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The Chapman standard was later refined in Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The supreme court stated that the inquiry was not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. The court found that when the trial court erroneously allows inadmissible evidence, the prosecutor has a very heavy burden to demonstrate in the appellate court that the error was harmless beyond a reasonable doubt. State v. Bell, 99-3278 at pp. 5-6, 776 So.2d at 422-23.
[10] We note that during jury selection in this case, 6 panels of 14 potential jurors were examined by the court and counsel before the 12-man and 2-alternate jury was empanelled. Of those 84 persons, 17 potential jurors were excused by the trial judge for various disqualifying reasons. Defendant asserted challenges for cause as to almost all of the remaining 67 prospective jurors. The trial judge granted 17 of defendant's challenges for cause and 14 challenges for cause asserted by the state.
[11] Article 63 provides the district attorney may employ or accept the assistance of counsel in the conduct of a criminal case.